# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                        CASE NO. 5:98cr28-RS-1

VICTOR GARCIA VILLARREAL[1],

       Defendant.

_____/

## <u>ORDER ON DEFENDANT'S MOTIONS TO DISMISS</u>

Before me are Defendant's Motions to Dismiss (Docs. 34 & 35).  Both motions are substantively identical and request dismissal of the indictment on the ground that the delay of approximately nine-and-a-half years between the filing of the indictment and Defendant's arrest violates Defendant's right to speedy trial under the Sixth Amendment to the federal Constitution.  The Government opposes the motions (Doc. 37).

---

[1]Defendant's last name has been spelled "Villareal" and "Villarreal" in the documents filed with the Court.  In response to the Court's inquiry about the proper spelling of Defendant's last name, defense counsel confirmed that the correct spelling is "Villarreal."  Accordingly, the Clerk is directed to amend the docket sheet to reflect the correct spelling of Defendant's last name; the parties are directed to incorporate the correct spelling in all future filings.

## I.  Background

Defendant Victor Garcia Villarreal was charged by indictment filed July 23, 1998, with conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a) & (b)(1)(A)(vii), and possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a) & (b)(1)(B)(vii).[2]  Defendant was arrested on January 8, 2008.

The pending motions to dismiss, both of which are substantively identical, request dismissal of the indictment on the ground that the delay of approximately nine-and-a-half years between the filing of the indictment and Defendant's arrest violates Defendant's right to speedy trial under the Sixth Amendment to the federal Constitution.  Defendant contends that the Government was negligent or engaged in only "routine" activities and "nothing out of the ordinary" in its efforts to find and arrest Defendant.  Defendant further avers that the "extraordinary" and "unnecessary" delay between the indictment and the arrest has presumptively prejudiced Defendant's ability to adequately prepare a defense.

The Government contends that the motions should be denied because the post-indictment delay was caused by Defendant's "deliberate efforts to avoid contact with the government."  The Government asserts that despite its "diligent efforts," it was "unable to locate Defendant, "a fugitive who may not even have been in the United States."

---

[2]A superseding indictment was filed on April 1, 2008, and modifies the initial indictment only to the extent that it specifies the quantities of marijuana relating to each charge.  Count One of the superseding indictment charges that Defendant conspired to distribute more than one thousand kilograms of marijuana; Count Two charges that Defendant possessed with intent to distribute more than one hundred kilograms of marijuana.

An evidentiary hearing on the motions to dismiss was held on April 14, 2008.  At the hearing, Defendant was represented by private counsel, and a Spanish-speaking interpreter was present.[3]  Following the presentation of evidence, I entered oral orders denying the motions.  This written opinion sets forth my specific findings of fact and conclusions of law.

## II.  Analysis

The sole issue is whether the approximately nine-and-a-half year delay between the filing of the indictment and Defendant's arrest has violated Defendant's right to a speedy trial under the Sixth Amendment.  Both parties agree that the issue is resolved under the legal principles articulated by the Supreme Court in *Doggett v. United States*, 505 U.S. 647, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992) and *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

In *Barker*, the Supreme Court emphasized that "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case":

> The right of a speedy trial is necessarily relative.  It is consistent with delays and depends upon circumstances.  It secures rights to a defendant.  It does not preclude the rights of public justice.

*Barker*, 407 U.S. at 522, 112 S. Ct. at 2188 (*quoting Beavers v. Haubert*, 198 U.S. 77, 87, 25 S. Ct. 573, 576, 49 L. Ed. 950 (1905)).  To clarify the "slippery" and

---

[3]Defendant is a citizen of Mexico.

"amorphous quality of the right" to speedy trial, the *Barker* Court rejected inflexible, rigid proposals that would have simplified the analysis of whether a criminal defendant's right to speedy trial has been violated[4] and instead adopted a balancing test.  407 U.S. at 530, 112 S. Ct. at 2191-192.

Under the balancing test enunciated in *Barker*, courts are required to weigh the conduct of both the prosecution and the defendant in determining whether a defendant has been deprived of his right to speedy trial.  *Id*.  The four factors relevant to that determination are:

> (1) Length of delay;
>
> (2) Reason for the delay;
>
> (3) Defendant's assertion of his right; and
>
> (4) Prejudice to the defendant.

407 U.S. at 530, 112 S. Ct. at 2192.  None of the four factors is either a necessary or sufficient condition to the finding of a deprivation of the right to speedy trial; "[r]ather, they are related factors and must be considered together with such other circumstances as may be relevant."  407 U.S. at 533, 112 S. Ct. at 2193.  In applying the factors, a court must engage in a "difficult and sensitive balancing process," while recognizing that "the accused's interest in a speedy trial is specifically affirmed in the Constitution."  *Id*.

---

[4]The *Barker* Court rejected the following two suggestions: (1) that the right to speedy trial be quantified into a specific number of days or months during which a criminal defendant must be brought to trial and (2) that a criminal defendant waives any consideration of his right to speedy trial for any period prior to which he has not demanded trial.  407 U.S. at 522-24, 112 S. Ct. at 2188-189.

**A.  Length of Delay**

Under *Barker*, "[t]he length of delay is to some extent a triggering mechanism.  Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."  *Id*.  The parties agree that the delay of approximately nine-and-a-half years between the indictment and the arrest is presumptively prejudicial.  *Doggett*, 505 U.S. at 652, 112 S. Ct. at 2691 (finding that "the extraordinary 8 1/2 year lag between Doggett's indictment and arrest clearly suffices to trigger the speedy trial enquiry.").  Therefore, it is necessary to assess the remaining three factors.

**B.  Reason for the Delay**

The *Barker* Court explained:

> Closely related to length of delay is the reason the government assigns to justify the delay.  Here, too, different weights should be assigned to different reasons.  A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.  A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.  Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

407 U.S. at 530, 112 S. Ct. at 2192.

Defendant does not contend that the Government deliberately delayed his arrest to obstruct his defense; rather, Defendant contends that the Government was

negligent or engaged in only "routine" activities and "nothing out of the ordinary" in its efforts to find and arrest Defendant.  A summary of the evidence relevant to this factor follows:

Robert Duncan, the case agent with the Drug Enforcement Agency (DEA), testified that Defendant orchestrated the conspiracy of which he is charged, along with three co-conspirators.  According to Duncan, the co-conspirators were charged, arrested, and then cooperated with the Government.  Duncan stated, and this Court's docket confirms, that a warrant for Defendant's arrest was issued on July 23, 1998, one day after the indictment was filed on July 22, 1998.

Duncan testified that the cooperating co-conspirators informed him that Defendant resided in Mission-McAllen, Texas, which is approximately ten miles, or just minutes, from the Mexican border.  Defendant is a citizen of Mexico. Duncan stated that a person attempting to cross the border into Mexico can do so with relative ease.

In early August 1998, Duncan, along with another DEA case agent and a customs agent, traveled to Defendant's purported residence in Texas.  They were accompanied by an informant, a cooperating co-conspirator, who claimed to know Defendant well.  Duncan, along with the agents and the informant, attempted to locate Defendant.  They visited several locations, including Defendant's purported home and place of employment.  Defendant was not present at any of the locations. Duncan testified that a person at one of the sites informed him that Defendant had fled to Mexico.

In 1998, the Government seized a a tractor-trailer owned by Defendant as property allegedly used in the commission of the crimes charged in the pending

indictment.  As part of the forfeiture proceedings, the Government sent Defendant a notice of the seizure and intended forfeiture.  Defendant did not file a claim to the truck, and the truck was ordered forfeited to the Government in October 1998.

DEA transferred the case to the United States Marshal Service in February 1999.  Deputy U.S. Marshal, Paul Joanos, testified that the Marshal Service entered the warrant for Defendant's arrest into the National Crime Information Center (NCIC) when the case was transferred, in February 1999.[5]  NCIC is a national crime information center run by the Federal Bureau of Investigation.  According to Joanos, "pretty much anything that any of us do[es]," including obtaining a job or applying for a new social security card, immigration card, or driver's license in any state, is cross-referenced by NCIC.  Upon entry of the warrant into NCIC, the McAllen, Texas, division of the Marshal Service, pursuant to its policy, attempted to find Defendant.  DEA and the Marshal Service verified each year that the warrant for Defendant's arrest was still active in NCIC.  NCIC produced no information about Defendant's whereabouts.  Defendant's driver's license had expired on March 12, 1997, a year before the indictment was filed.  The license was not renewed.

Duncan and Joanos also testified that they monitored a separate database called "Auto Track" in their efforts to find and arrest Defendant.  Auto Track processes information from the three national credit bureaus.  According to Joanos, any credit-related information about Defendant, including real estate and business transactions, address changes, and vehicle registrations in any state would appear

---

[5]Joanos was assigned to the case in 2005, when he joined the U.S. Marshal Service satellite office in Panama City, FL.  Prior to that time, the case was assigned to a different deputy U.S. Marshal.

in Auto Track.  Each year from the date of the indictment until Defendant was arrested, the Marshal Service unsuccessfully searched NCIC and Auto Track for information about Defendant's whereabouts.

On two occasions during the post-indictment period, the Marshal Service identified two subjects, one in Maryland and the other at the Houston International Airport, who matched Defendant's information or characteristics.  After comparing the suspects with Defendant's photographs and fingerprints, however, it was determined that neither subject was Defendant.

Joanos stated that on January 20, 2005, deputy marshals in Texas again returned to Defendant's purported residence.  Neighbors conveyed to the marshals that "they had not seen [Defendant] in quite awhile."

Joanos then contacted Homeland Security and requested that a "border lookout" be placed on Defendant.  Defendant's name was included in a list of fugitives and given to law enforcement patrolling the Texas-Mexico border.  According to Joanos, persons entering the United States are cross-referenced by law enforcement against the list.  If a fugitive whose name appears on the list attempts to enter the United States, law enforcement would take that person into custody.  Defendant was arrested on the outstanding warrant when he entered an office of Homeland Security and applied for a new resident alien card in 2008.

The final witness who testified on behalf of the Government was Anthony Koziol, an adjudications officer with the United States Citizenship and Immigration Services ("USCIS").  Koziol stated that Defendant's application for legal residency based on marital status had been denied by USCIS because Defendant failed to appear twice for the required interview.  In addition, then-INS

mailed a letter to Defendant in 1997 requesting that he appear before its investigative branch for questioning related to an alleged criminal offense. According to Koziol, the post office returned the letter as undeliverable.  Koziol testified that Defendant had no contact with USCIS between December 1997 and his arrest in 2008.

During the week prior to the evidentiary hearing, Duncan traveled to the Mission-McAllen, Texas, area.  He spoke with Santos Salinas, a former business acquaintance of Defendant.  Salinas conveyed to Duncan that in 2000, he attempted to contact Defendant to repay a large debt and to re-establish a connection for smuggling marijuana.  Defendant's family members, however, conveyed to Salinas that Defendant now lived in Monterey, Mexico, because he was wanted by authorities.  Duncan stated that Salinas has lived in the Mission-McAllen area continuously since 2000; that Salinas has maintained relationships with individuals who distribute controlled substances; and that Salinas has not seen or heard from Defendant since his unsuccessful attempt to contact Defendant in 2000.

Defendant complains that the Government's efforts to find Defendant were negligent.  In the alternative, Defendant avers that the Government's efforts were "routine" and "nothing out of the ordinary."

In support of these contentions, Defendant asserts that on April 23, 2004, and on March 14, 2005, a notary public in Texas acknowledged Defendant's physical presence and signatures on documents in which Defendant conveyed real estate to his wife.  Defendant contends that these documents prove that Defendant was present in Texas on those dates.

In addition, Defendant produced credit card statements, one from 1993, two from September 2003, and one from July 2005, addressed to Defendant or to Defendant and his wife at their purported residence in Texas.  The statements indicate that payments were being made on the cards.

Defendant's nephew and sister testified on Defendant's behalf.  Both stated that Defendant lived at the Texas residence continuously from the late 1990's to 2005, when Defendant and his wife separated.  According to their testimony, Defendant moved to a border town in Mexico in 2005, but frequently returned to the Mission-McAllen, Texas, area to visit.

I find that the evidence presented by Defendant fails to support his contention that the Government acted negligently or is responsible for the delay in his arrest.  In fact, the documents conveying real estate that were signed by Defendant and acknowledged by a notary public in Texas undermine Defendant's position.  Both documents list Defendant's mailing address as Tamaulipas, Mexico.  Thus, although Defendant may have traveled to Texas on two dates in 2004 and 2005, the documents indicate that Defendant resided, or at least considered his mailing address, to be in Mexico.

 The credit card statements are equally entitled to little or no weight.  As to the credit card statement dated 1993, that statement was produced five years before the relevant time period and thus has no bearing on the merits of the motions.  As to the credit card statements dated September 2003, and July 2005, those three credit card statements, along with a resident alien card and the two documents conveying real estate that listed Defendant's mailing address as a Mexican address, are the sole documentary exhibits introduced into evidence by Defendant. Defendant submitted no tax returns, pay stubs, check copies, bank statements,

receipts, bills, records, letters, or *any* other documents that would have supported
Defendant's contention that he was living in the United States from 1998 to 2008,
or that the Government, through reasonable efforts, could have located Defendant.
Indeed, Defendant's Texas driver's license expired in 1997, and was not renewed.

The lack of documentary evidence supporting Defendant's claimed
whereabouts from 1998 to 2008 is startling.  Although it is not improper or illegal
to lead a paperless existence, it is highly unusual in contemporary society that
Defendant could not produce additional records confirming his whereabouts,
particularly when dismissal of a federal criminal indictment hinged upon it.
Because Defendant did not produce such records, I can only conclude that
Defendant had no such records or that such records, if they existed, would not have
supported Defendant's position.[6]

The testimony of Defendant's nephew and sister that Defendant regularly
resided in Texas is also entitled to little weight.  That testimony is contradicted by
the testimony of Duncan and Joanos who stated that individuals familiar with
Defendant, as well as Defendant's family members, conveyed to their agencies and
their informants that Defendant was aware that he was wanted by law enforcement
and that he had fled to Mexico.  In addition, Defendant's sister conceded, upon
questioning by the Government, that she is a citizen of Mexico, and visits the
United States for short visits and infrequently.  When defense counsel asked
Defendant's sister whether she was able to locate any person unrelated to
Defendant who could serve as a witness and verify Defendant's whereabouts

---

[6]Defendant's sister testified that she obtained all the documents that were
presented as evidence and that there were "very few."

during the period from 1998 to 2008, she answered in the negative.  Defendant's sister also conceded that Defendant possessed a Mexican driver's license that would have permitted him to travel between border towns without incident.

     Based on the evidence presented, I find that the Government acted with due diligence in its efforts to find and arrest Defendant and that Defendant is responsible for the delay in his arrest.  It was reasonable for law enforcement to conclude that Defendant had fled to Mexico or was purposely evading them.  A warrant was issued the day after the indictment was filed.  Federal agents searched the border town in Texas where Defendant purportedly resided.  Various individuals, including Defendant's family members, conveyed to federal agents that Defendant was wanted and that he had fled to Mexico.  Other individuals stated that they had not seen or heard from Defendant during the relevant period. Defendant's Texas driver's license expired in 1997, and was not renewed.  Prior efforts by the USCIS to contact Defendant were unsuccessful.  In 1997, USCIS denied Defendant's application for legal residency because he failed to appear twice before it.  The seizure and forfeiture proceedings of Defendant's truck placed Defendant on notice of his alleged criminal activities.  Authorities monitored two national databases each year from 1999 until 2008 for clues about Defendant's whereabouts.  Information from the databases led U.S. marshals to two subjects, one in Maryland, the other in Houston, Texas, thought to be Defendant.  Marshals placed a border lookout on Defendant which ultimately led to his capture in January 2008.

     Defendant does not dispute that he is a citizen of Mexico and resided in Mexico at least some of the time during the relevant period.  Defendant's own evidence indicates that his mailing address, at least in 2004 and 2005, was

Tamaulipas, Mexico.  The meager documentary evidence offered by Defendant in support of his claimed whereabouts during the entire ten-year period from 1998 to 2008 were three credit card statements, two dated September 2003, and one dated July 2005.  If anything, the lack of evidence produced by Defendant suggests that Defendant's connection to the United States during the relevant period was tenuous at best.

The dearth of witnesses who could vouch for Defendant's claimed whereabouts during a ten-year period equally undermines Defendant's position. Only two witnesses, both of them family members, testified in support of Defendant's claimed whereabouts.  One of the witnesses was Defendant's sister, a citizen of Mexico who conceded that she makes short, infrequent trips to the United States.

The facts of this case are thus distinguishable from the facts in *Doggett*, where the Supreme Court found that a simple computer inquiry would have led authorities to the defendant.  The *Doggett* Court concluded that "[f]or six years, the Government's investigators made no serious effort to test their progressively more questionable assumption that Doggett was living abroad, and, had they done so, they could have found him in minutes."  505 U.S. at 652-53, 112 S. Ct. at 2691.  In characterizing the Government's efforts to find Doggett as "inexcusable oversights," the Court relied on the facts that the government had permitted Doggett's name to expire and vanish from a national database system; had assumed that Doggett was living in Panama, although the American Embassy in Panama had conveyed to the State Department information that was to the contrary; and made no effort to "track Doggett down, either abroad or in the United States."  505 U.S. at 650, 112 S. Ct. at 2689.  The Court found that "Doggett remained lost to the

American criminal justice system [for eight-and-a-half years], when the Marshal's Service ran a simple credit check on several thousand people subject to outstanding arrest warrants and, within minutes, found out where Doggett lived and worked." *Id*.  The Supreme Court noted that upon Doggett's return to the United States, "he has married, earned a college degree, found a steady job as a computer operations manager, lived openly under his own name, and stayed within the law."  505 U.S. at 649, 112 S. Ct. at 2689.

Here, Defendant does not contend that a simple computer search would have revealed his location.  Government witnesses testified that they conducted yearly computer searches; made personal visits to Defendant's last known address; spoke with family members and informants; and explored leads.  I also note that, unlike *Doggett*, no evidence suggests that Defendant has furthered his education, found a steady job, lived openly under his own name, or stayed within the law during the intervening nine-year period between the indictment and the arrest.  In fact, Defendant does not hold a U.S. driver's license and never re-established residence in the United States after his purported move to Mexico in 2004 or 2005.

In contrast then to the wealth of information about Doggett's activities in the United States, the lack of documentary and testimonial evidence produced by Defendant about his own activities during the nine-year period is both cause for suspicion and relevant to the analysis.

> A true fugitive, whose location is unknown, or who is successfully resisting government efforts to bring him into the jurisdiction, will not be able to obtain dismissal of an indictment.  This is as it should be.  Otherwise, the courts would be sanctioning the playing of games by fugitives.

*United States v. Salzmann*, 548 F.2d 395, 404 (2d Cir. 1976) (Feinberg, J.,

concurring). A defendant who deliberately avoids arrest waives the right to a

speedy trial.  *United States v. Sandoval*, 990 F.2d 481, 484-85 (9th Cir. 1993).

     Defendant asserts that the Government "could have done more" in its efforts

to find him.  According to Defendant, law enforcement "knew that he was out there

in Mission, Texas, close to the border," and "[the Government] did the normal

things that [it] would do under normal cases, which was not enough specifically for

this case."  Defendant's arguments are baseless.  Defendant does not deserve

special treatment by law enforcement.  Defendant's implication that the

Government should have assumed that he was a flight risk because of his close

proximity to the border undermines his contention that he did not attempt to elude

capture.  And while the contention that the Government could have "done more"

might always be raised, the law is clear that "[t]here is no requirement that law

enforcement officials 'make heroic efforts to apprehend a defendant who is

purposefully avoiding apprehension.'" *Rayborn v. Scully*, 858 F.2d 84, 90 (2d Cir.

1988).  Based on the evidence, I find that the Government acted with due diligence

in its efforts to find Defendant and that Defendant attempted to avoid arrest.

Therefore, the first factor – the reason for the delay – weighs against Defendant

and in favor of the Government.

### C.  Defendant's Assertion of Right

     The *Barker* Court determined that although the primary burden is on the

Government and the courts, not the defendant, to bring the defendant to trial, "this

does not mean, however, that the defendant has no responsibility to assert his

right" to speedy trial:

> Whether and how a defendant asserts his right is closely
> related to the other factors we have mentioned.   The
> strength of his efforts will be affected by the length of the
> delay, to some extent by the reason for the delay, and most
> particularly by the personal prejudice, which is not always
> readily identifiable, that he experiences.  The more serious
> the deprivation, the more likely the defendant is to
> complain.  The defendant's assertion of his speedy trial
> right, then, is entitled to strong evidentiary weight in
> determining whether the defendant is being deprived of the
> right.  We emphasize that failure to assert the right will
> make it difficult for a defendant to prove that he was denied
> a speedy trial.

407 U.S. at 528, 531-32, 112 S. Ct. at 2191-193.

During the nine-year period between the indictment and arrest, Defendant
failed to assert the right to speedy trial.  When the tractor-trailor owned by
Defendant was seized and forfeited to the Government as property allegedly used
in the commission of the crimes charged, Defendant was placed on notice of his
alleged criminal activities as early as October 1998.  Defendant nevertheless failed
to assert his right to timely answer to the charges.  That finding, in conjunction
with my previous findings that the Government acted with due diligence in its
efforts to locate Defendant and that Defendant attempted to avoid arrest, inform my
conclusion on this third factor.  I find that the third factor – Defendant's assertion
of the right to speedy trial – again weighs against Defendant and in favor of the
Government.

### D.  Prejudice to the Defendant

The *Barker* Court explained the fourth factor as follows:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect.  This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.  Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

407 U.S. at 532, 112 S. Ct. at 2193.

The first two interests articulated in *Barker* are inapplicable to this case.  No evidence supports a finding that the prolonged period between the indictment and the arrest has interfered with Defendant's liberty, disrupted his employment, drained his financial resources, curtailed his associations, subjected him to public obloquy, or caused anxiety for him, his family, or his friends.  *United States v. Marion*, 404 U.S. 307, 320, 92 S. Ct. 455, 463, 30 L. Ed. 2d 468 (1971).

As to the third, most important, interest, *Doggett* held that

> if the Government had pursued Doggett with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail.  Indeed, that conclusion would generally follow as a matter of course however great the delay, so long as Doggett could not show specific prejudice to his defense.

505 U.S. at 656, 112 S. Ct. at 2693.  Defendant identifies no particularized prejudice to his defense.  In contrast, the Government asserts that it, not Defendant, has been prejudiced by the delay.  According to the Government, cooperating witnesses central to its case against Defendant, including Defendant's alleged co-

conspirators, have died, have been deported, or cannot be located.  The Government contends that it will rely on the deposition testimony of those witnesses at trial.

Although Defendant generally complains that he will be unable to cross-examine the witnesses, he fails to identify any specific prejudice.  Defendant does not contend that defense witnesses or evidence which might support his defense are unavailable or missing.  The Court in *Barker* stated:

> [D]eprivation of the right [to speedy trial] may work to the accused's advantage.  Delay is not an uncommon defense tactic.  As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade.  If the witnesses support the prosecution, its case will be weakened, sometimes seriously so.  And it is the prosecution which carries the burden of proof.  Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not *per se* prejudice the accused's ability to defend itself.

407 U.S. at 521, 92 S. Ct. at 2187.  Because no evidence supports a finding that Defendant will be prejudiced by the delay, I find that the fourth factor – prejudice to the defendant – weighs against Defendant and in favor of the Government.

### III.  Conclusion

Because I find that Defendant, and not the Government, is primarily responsible for the delay in his arrest; that Defendant had knowledge of the indictment and failed to assert his right to speedy trial; and that Defendant is not prejudiced by the delay, I conclude that Defendant has not been deprived of his

constitutional right to a speedy trial.

Accordingly,  Defendant's Motions to Dismiss (Docs. 34 & 35) are **DENIED**.

**ORDERED** on May 7, 2008.

/s/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**